We'll hear argument this morning in Case 2013-12, Becerra v. Empire Health Fund. Mr. Bond. Mr. Chief Justice, and may it please the Court, the Medicare fraction directs HHS to count patient days of patients who, for such days, were entitled to benefits under Part A of Medicare. The question here is which patients are entitled to Part A benefits. Section 426 states that every individual who satisfies certain requirements shall be entitled to Part A benefits. And that provision and others make clear that the entitlement is not absolute but subject to conditions, and it is not negated merely because Medicare does not pay for particular units of care. That is the best reading of the statute's text, context, and its population-focused design, and at a minimum, a reasonable reading that deserves deference. The Court of Appeals and Respondents' contrary reading rests on two inferences based on other language concerning other programs. The Court of Appeals inferred from Congress's references to persons eligible for Medicaid that in the Medicare fraction, Congress must have meant entitled to Part A to mean something different than it means throughout the statute. But Congress's use of entitled and eligible is fully explained by its usage of those terms in the underlying Medicare and Medicaid programs governed by separate statutory frameworks. Congress simply took those terms as it found them. Respondent contends that the agency's approach to SSI benefits conflicts with its position here. That is not correct, as the agency explained in the 2010 regulation, and as the Sixth Circuit explained in Metro Hospital. But even if there were a conflict, the solution is not to skew the meaning of entitled to benefits under Part A. The Court should give that phrase the meaning that Congress did in the statute and reserve the SSI benefits issue for a future case. I welcome the Court's questions. Mr. Bond, before we get bogged down in this indecipherable language, what's the difference between entitled to and eligible for? So in the context of these programs... No, no, no. Just in ordinary meaning. So in ordinary language, I think entitled refers to having a right to something, but that something may itself be subject to conditions. It does not signify an absolute right. The District Court, at Petition Appendix 42A, pointed to dictionary definitions that go in both directions, and I think that's consistent with ordinary usage, as our season ticket holder example explains. Now, in ordinary usage, eligible more naturally means that someone qualifies for something, which is one of the definitions of entitled in the dictionaries the District Court identified. But whatever the ordinary meanings of those terms, I think it's clear how Congress used them in this particular setting with respect to entitled in Part A. You know who is entitled from Section 426... How far can we go with that? If there's no definition of entitled in the statute, can we redefine it simply by looking at how it's used throughout the statute? So, to be clear, our argument is not how it's used. We think there is what functions as a definition, both of who is entitled and what that entitlement means. Now, those provisions are at 426A and B, which answers the question who is entitled. It says every individual in these categories shall be entitled. And then it says in 426C1 and 1395D what that entitlement consists of. And it says that that entitlement is a right to have payment made for certain services, but subject to conditions set forth in the statute. So the statute is telling you that entitlement here does not mean an absolute right. And I think that's clarified further by Section 1395L, which refers in two places to a person who is entitled to benefits under Part A, but has exhausted them, showing that exhaustion and entitlement can coexist, and further distinguishes that person from one who is not entitled to Part A benefits at all. Mr. Bond, you are interpreting the word entitled to mean something different in the same sentence, different with respect to Medicare and SSI. So that's problem one. Then you're interpreting the word entitled actually to mean the same thing as eligible, Justice Thomas' question, even though they are different words and should therefore convey different meanings. So that's problem two. And then the phrase for such days, as I analyze this, becomes surpluses. Then we look at the history of this. And for the first 20 years, you interpreted eligible for Medicaid to mean entitled. And the courts all said, well, you can't do that. Eligible is something different from entitled. So you correct that by saying, oh, we can't interpret eligible to mean entitled, so we're going to interpret entitled to mean eligible in the Medicare fraction. So that's problem four. And then in the administrative process, I know you're just a lawyer, in the administrative process, HHS misdescribes the existing rule and the proposal, corrects it a week before the comment period closes, and finally changes the final rule from what it had been. So that's problem five. We've whacked agency rules for much less than that. I know that's not the issue presented, but it is an atmospheric here. So there's just kind of a panoply of problems here. And that's more of a comment for you to figure out how to respond to. That's a lot of problems. Sure. If I may respond to those in turn. Starting with the use of entitled in the Medicare fraction, referring both to entitled SSI benefits and Part A benefits. Our interpretation of that term is consistent in that we read it to mean a person who is entitled by the statute that's being referenced. Those statutes, as the Sixth Circuit and the 2010 regulation explained, use entitled differently. In the Medicare statute, a person who satisfies these criteria is entitled by operation of law as the D.C. Circuit in Hall v. Sebelius explained. That's not how it works under SSI. The entitlement does not arise automatically. There must also be an application and a determination. I don't see why that matters, but keep going. Sure. Our point is that we are interpreting the phrase consistently. And that fits with both the nature of the benefits under those two programs and with how Congress is using the terms here. SSI is a cash benefit program. So to say that someone is entitled to that cash benefit more naturally signifies a person who is able to get that benefit. Medicare Part A is hospital insurance coverage. And it is perfectly natural to say that a person is entitled to that coverage even though their insurer won't pay for particular units of care, including because a third party was responsible for the injury and so the third party insurance must pay for it. And that's one of the issues here. Respondents' theory would say if the person's injury was caused by a third party whose insurer must pay, that person moves from the Medicare fraction and that population that Congress separately addressed for at least that patient's day to the other fraction. We don't think that's consonant with the statute. Mr. Bond, I think Justice Kavanaugh left out problem six, which is that there's a back story to all this. And that was that Congress was, I would say, extremely frustrated with what the agency was doing over time. Several times they tried to tighten the statutory language to push it, I would say, fairly say, in a direction contrary to what the agency wanted. So it strikes me as a situation where I think we ought to be particularly precise in interpreting the language Congress used without any gloss added by the agency. So if I can address that history in turn before returning to the rest of Justice Kavanaugh's question, I think the history is more complicated and nuanced than it's sometimes described and I'd like to walk through it in a bit of detail, but I think the through line is that the agency is not flouting Congress, but responding in good faith under the circumstances to actions by Congress and judicial decisions. I think the relevant history starts in 1983 in the statute that created the prospective payment program. In that statute, Congress did tell HHS to adopt adjustments including for low-income patients, but what it said was, as the Secretary deems appropriate. And the agency determined after looking at the data that it didn't think an adjustment was appropriate. That's reflected in a series of Federal Register rulemakings that are cited collectively at JA 39 to 40. So the agency made that initial determination. Now, at that point, you're right, Congress disagreed and said, no, you really must adopt a definition and it gave the agency a very short deadline that the agency didn't meet. But when a court ordered the agency to meet another deadline, the agency complied. All of that was overtaken by the 1986 definition that Congress adopted. Now, the agency did interpret that for the first decade or so not to include patient days that were not paid for, i.e., covered by the Medicaid or Medicare programs. And Congress did not step in to correct that. But four courts of appeals did reject that interpretation in the context of the Medicaid fraction. And the agency responded by acquiescing to those courts' decisions and it then carried over that interpretation to the Medicare context. Mr. Bond, in that history, what's helpful to the government? What's helpful is... I mean, I've heard a lot of detail, but the through line doesn't seem to be an effort to fully vindicate the terms of the statute. It seems like at each step of the way, there's some foot dragging that's an issue. There may have been inefficiency or a misunderstanding of Congress's direction, but I think that's fundamentally different than the agency trying to flout the directives. Fair enough. I don't mean to cast aspersions on intentions. Just the facts on the ground are mistakes and mistaking Congress's intention repeatedly. Is that a fair through line of this? I think there are several occasions of mistaking what Congress clarified was its intention. And I think what the agency did in 2004 was carry over the approach that it understood from the courts of appeals was appropriate in approaching the Medicaid fraction to the Medicare fraction to focus not on which patient days are paid for by a program, but whether a person satisfies the definition of the term Congress used, eligible as opposed to entitled. Counsel, how do you, or do we, give you any Chevron deference for this interpretation? Are you relying on that at all, or are you taking the position that this is what the statute plainly says, even though, as Justice Kavanaugh pointed out, that's subject to a great deal of dispute? What we're saying is two things. We think we have the better reading, writing on a clean slate, and at a minimum, a reasonable reading. Answer my question. Do you think you're entitled to Chevron deference? We do think we are entitled to Chevron. So how do you get past Encino motor cars, given the odd flip-flopping in the administrative process? First, misstated its existing policy in 2003. You correct the misstatement at the end of the rulemaking process in 2004. But what's most significant to me, the final rule did the opposite of what the agency initially proposed to do. So there's sort of three steps, all of them at the end of an agency process. I don't see how we give you Chevron deference under those circumstances. I would say several things, first about Encino, and then about the particular rulemaking history here. Encino does not hold that a procedural error of any kind results in a lack of Chevron deference. I think that the error at issue there was fundamental. The agency had engendered substantial reliance interests that it did not address. That's not at issue here. Moreover, the procedural error that is asserted was rejected by the Ninth Circuit, and this court declined to review that determination. What does that have to do with anything? Whether there's an administrative failing under the APA is a different question than, are you entitled to deference for an interpretation that it took you until the end of the process to fix, and then when you fix it, you do the opposite of what you said you were going to do. So on those points, deference goes to the final rule, the final decision-making made by the agency, not to its earlier statement. So deference hinges on what the final rule said. Now, to your point about the gap between the final rule and the proposal, the proposed rule put a binary choice to commenters, and these are sophisticated providers, between counting these days in the Medicaid fraction as the agency proposed and, as Respondent Powell argues, and including them in the Medicare fraction, which the agency mistakenly described as its existing policy, but those two options were on the table for commenters. Can you point to any other statute? You said you have the better reading, where Congress uses words that have three meanings, same words that have three meanings. That's what basically you're saying, which is entitled to is different from eligible for, and it's different for what we're going to do to SSI. So we don't have a statute that gives the same terms three meanings, and that's not what we're saying here. We are saying that entitled and eligible have similar meanings in practice because the underlying statutes use those two different terms to refer to similar ideas. Is it fatal for your argument if they don't use similar terms throughout? No, it's not fatal to our argument. Meaning that the statutes don't use eligible or entitled consistently throughout. The Medicaid statute does consistently use eligible for Medicaid assistance to describe the category of individuals that are covered. But the Medicare statute doesn't. The Medicare statute refers to entitled to Part A benefits to describe this category of persons. Not only because you're saying it does, but the Act itself doesn't use entitled throughout. It uses entitled sometimes and eligible other times. When it uses eligible, however, Your Honor, I think it's referring to something different. In Parts B, C, and D, and these provisions are cited in our brief, Congress refers to a person who is eligible to enroll in those programs if they are entitled to benefits under Part A. And when that person enrolls in that program, they then become entitled to that opt-in program. Mr. Braun, could you say something about what the Medicare fraction is designed to do? Which of the two interpretations fits that best? I assume you will say yours. And if that is so, why? The Medicare fraction, combined with the Medicaid fraction, are designed as proxies for the percentage of low-income patients a patient has because Congress, as this Court has explained, thought that hospitals that serve a greater number of low-income patients will necessarily have higher costs. I think everybody agrees with that, Mr. Vons. I have the same question as Justice Alito. I mean, each of your formulas excludes certain categories of people who would generally be thought to be low-income. And the question is, how is it that your formula better reflects that purpose from Congress than the Respondent's formula? So, two points. The first is that Congress went about this in a bifurcated way, looking at two different populations. Now, if you take that premise, which I think is clear from the face of the statute, our approach is much more sensible because it divides those populations based on their status as a Medicare beneficiary. That's why it's in the numerator and the denominator of the Medicare fraction. Whereas on Respondent's view, which population you're in turns on the happenstance of who ultimately paid for your care. Now, to the point of persons excluded versus not excluded under the different readings, I think that illustrates the same logic of Respondent's approach. So, it's true that on our view, a person who is entitled to SSI, I'm sorry, a person who is not entitled to SSI but is entitled to Medicaid and is a Medicare patient, doesn't count in either fraction. We think that follows directly from Congress's choice to make for Medicare participants SSI the exclusive proxy. But Respondent's reading doesn't add back that category of dual eligible patients who don't qualify for SSI unless they happen not to have had Medicare pay for their care. So, you could have two beneficiaries who are equally low income and on Respondent's view, one is added to the Medicaid fraction and one is not based on the fact that one was hit by a third party in a car accident and for that reason, Medicare did not cover their care. Why is it that the denominators of the two parts are different? If I understand your theory, it's essentially that the Medicare fraction is meant to deal with one population, the senior population, and the Medicaid formula is meant to deal with non-seniors and that makes some sense. But then, why would Congress have used the same denominator in both? So, Congress didn't explain its use of those different denominators. We know from the conference report that it's a compromise between approaches that did those different things. Medicare patients, low income Medicare patients, among all Medicare patients, and low income measured by Medicaid against all. Congress fused those two different measures, not in a way that you add together the patients, but that you effectively average out those two proxy measures that examine different parts of the population. And Congress may have determined that both of these approaches have some value and some merit and we should combine them. And the one adjustment that it made was taking Medicare patients out of the numerator of the Medicaid fraction to avoid double counting them. Mr. Bond, I have a question about the difference between SSI and Medicare Part A and the use of the word entitled. If I understand your argument, you said in response to Justice Kavanaugh that the distinction was that for Medicare, eligibility or entitlement arises directly by operation of law, whereas for SSI, it occurs after determination. Correct? That's right. Is that always true for Medicare Part A? However, I mean, I see why it's true for seniors, for people who are over 65. But it's my understanding that for people who are entitled to it based on disability, there did have to be a determination because somebody has to say that, in fact, you're disabled and you qualify. There's a determination of that predicate qualification. But once you possess that qualification, you are entitled to Medicare Part A benefits. In certain circumstances, you must enroll to access those benefits. But you have a legal entitlement that, as the D.C. Circuit recognized, cannot even be disclaimed. There's a determination of that underlying disability. But why is that different? It doesn't arise magically by operation of law. If someone is disabled and it's unclear whether the disability qualifies, just in the same way that it doesn't arise magically by operation of law that someone's entitled to SSI, both depend on a predicate determination. I think the point is not that one is dependent exclusively on a predicate determination and the other is not that the Congress specified which individuals fall into these categories. We understand entitled to SSI to being those persons whom SSA has determined are entitled to SSI benefits, which requires the application and determination. If we are wrong about that and we're undercounting SSI, however, the correct answer is not to skew the meaning of entitled to benefits under Part A, which Congress has said encompasses everyone who satisfies this definition and is not the same as persons who still have benefits that are unexhausted. You should reserve the SSI issue for a case in which it is presented. That issue is being litigated in lower courts right now, including a case in the District of Columbia. If I think that you both have reasonable interpretations, what should we do with the Encino issue? Should we decide it? Do we have to decide it? Should it be disputed? So with respect to the Encino issue, if you mean the should we afford Chevron deference to the agency's view, I think you should because the agency did not disrupt reliance interest. And if I can return to the rulemaking process, the agency put those two options in front of commenters. Commenters did weigh in on those issues. Commenters overwhelmingly favored the substance of the approach that the agency ultimately adopted. And so I don't think there's a procedural error of that kind. Wasn't it unclear what the commenters thought they were being asked to comment on? In other words, the commenter who said, I approve of the status quo, it was unclear whether that was the real status quo or the status quo as misdescribed by the agency? By and large, the substance of their comments are not about what the agency was already doing. They refer to the agency's proposal as a change because that's how the agency had framed it. But their arguments went to the substance of the two proposals. The Federation of American Hospitals, one of respondents' own amici, said that the agency lacked statutory authority to do what respondent is now urging. That would not turn on which approach the agency was already adopting. You had to really read all those comments in 2003. That's right. That's quite a job. I mean, do I understand this correctly? And the chances I understand it correctly are near zero. Okay? Just follow this and see if I understand it. There are two fractions. Call them Fraction 1 and Fraction 2. Medicare and the Medicaid. Okay? Medicare and Medicaid over Medicare and SSI over Medicare. Okay. Fraction 1, Fraction 2. And there are a few people who have Medicare. Some people have Medicare, but their benefits, Medicare won't pay. And it might not pay because, in fact, there's somebody else to pay. Or it might not pay because they used up all they had on Medicare. Okay, so they won't pay. Now, what do we do with those people? Do we put them in 1 or do we put them in the denominator of 2 somehow? Okay? That's the issue. And so let's call them people who've exhausted their benefits. So these people are exhausted, just like me after reading this case. Okay? We're exhausted. And now what do we do with the exhausted people? And the fact is, in 2003, not even the agency knew what they were doing with the people. They wrote down that we have put all these people, I think, in 1. But they hadn't. They actually put them in 2. Or maybe it's vice versa. But I think I got it right. So now they say, what should we do? They say, let's put them in 2. By now it's 2008. And after they read the comments, they say, no, we're going to put them in 1. Now, if I'm right so far, the exhausted people are now in this rule over in 1. And that's where I am. Exhausted. Okay? So that's where they are. You know how many people understood this from 2003 on? Two. Two commenters out of God knows how many actually understood it. So if I were in Congress and I had this issue in front of me, you know what I would say? Let the agency do what it wants as long as it's reasonable. Because I have no idea. And so my question is, how are we expected, nine people, when only two people in the United States in 2003 understood it in the way of comments? How are we supposed to decide who's right? I mean, if it were so obvious, it wouldn't have taken 17 years to get to this point. To pick up on that last point, the fact that Congress has not intervened in the 17 years since the final rulemaking, I think tells you that Congress did not think the agency had strayed and did not disagree with the agency's approach. And it's not because Congress wasn't watching. As we note in the reply, Congress specifically intervened to approve the agency's Medicaid regulations relating to demonstration projects and yet left its approach to this issue unaltered. Now, to the substance of your question, the exhausted patients belong in Fraction 1 because their exhaustion of certain items of care does not transform them into non-Medicare patients, and they can still get other Medicare Part A benefits, even if they've exhausted their inpatient care. But to the extent that the Court thinks that question is unclear, that's a quintessential question for the agency. Thank you, Counsel. Justice Thomas, anything further? Justice Clark. Justice? Justice Gorsuch, anything further? What do we do about the fact that, as in this case, Chevron is very often asserted by the government to defend an interpretation that not only few people were given any advance notice of or understood, maybe they were too exhausted to understand by the time it all was adopted, but also tends to favor the government's own pecuniary interests? Should we be granting deference in those circumstances? I don't think a carve-out to deference based on which way the needle goes in terms of the federal government's expenditures or not. We normally, you know, you normally take into account when you're interpreting a document who writes it and their pecuniary interests. Why would this be different? Well, I think in this particular instance, the fact that the overwhelming majority of commenters said that counting these patients in Fraction 1, the Medicare fraction, was better for them than counting them in the other, and that the agency said it's going to depend on the hospital, we are not making a decision either way, but even adopted the approach that the commenters, the sophisticated providers preferred, I think undercuts any inference that the agency here was trying to undermine payments. Everyone agrees the goal is to increase payments. The question here is by precisely how much for precisely which providers. The agency provides billions of dollars a year, and the question is exactly how much more it must provide to certain providers. Justice Kavanaugh? To pick up on the Chief Justice's earlier question and Justice Gorsuch's question about the through line, it seems from a 30,000 foot level that the through line is the agency wanting to spend as little as possible on this program, because entitlement spending, mandatory spending, is a huge part of the federal budget, and the agency, especially in 2003, 2004, 2005, the new prescription drug benefit had just come in, which was going to be a huge new expenditure for the government, and so the government, the administration at that time, was looking for places to restrain the growth, or cut, in government speak, spending. And that's the through line going all the way back, as the Chief Justice says, to the beginning, and you do it by interpreting eligible to mean entitled to begin with, and then interpreting entitled to mean eligible. So why, when we look at the whole picture, is that wrong to see? And it's not, it's a laudatory motive, but the question is the statutory language getting in the way. Why shouldn't we see the through line as the government wanting to be stingy in its payout of these benefits? Because I don't think that tracks what the agency said at each of those times. In 1984, it said, we've looked at the data and don't think an adjustment is warranted. Subsequently, after the 1986 statute, it looked at the statute and thought, based on the legislative history and the language, that Congress didn't intend to include non-covered persons. But four courts of appeals rejected that. So the agency is responding as those events unfold. But I think at a broader level, the answer to the question, which interpretation is best, can't be answered by broad-brush statements of congressional purpose to increase payments, especially given the highly reticulated calculation set forth at 18A to 25 of our appendix, where Congress laid out all these detailed things. So it's not the agency trying to skew the calculus one way any more than it's Congress trying to maximize payments. Indeed, in the Affordable Care Act, Congress reduced the amount of these payments. One final question. Do you agree, though, that the agency's approach from the mid-'80s through those four courts of appeals was to lower payments compared to what it would have otherwise been, and then its approach starting in 03, 04, 05 similarly was to lower payments compared to what it otherwise would have been? So we're not in a position to dispute that it generally had that effect. We don't, in the ordinary course, calculate the effects on individual hospitals because the agency calculates the Medicare fraction, but the remainder of the equation is calculated by the contract. You say you're not in a position to dispute. It's an almost impossible dispute, isn't it? I mean, the letter you sent in and the stats in your brief, I just... And what that letter reflects is that for hospitals in the Ninth Circuit, for most but not all, the Medicare fraction would go up. Now, the numbers that we provided do not translate directly into payments, but, yes, the general tendency is if you have a higher Medicare fraction, there may be a higher payment at the end of the process. That amount is probably going to be small. The median and mean, as we note in the letter, are really quite modest, and it still depends on the hospital's population, and that, I think, is the agency's approach. Thank you. Justice Barrett? Thank you, counsel. Mr. Headache? Mr. Chief Justice, and may it please the Court, in the face of HHS's recalcitrance, Congress gave HHS detailed instructions to ensure that hospitals that treat a disproportionate share of indigent patients are properly reimbursed. HHS has repeatedly violated those clear instructions and has done so again here. In this case, HHS has concluded that inpatients are entitled to benefits under Part A, for days on which they are entitled to no Part A benefits, no inpatient benefits because those benefits have been exhausted, and no other benefits because all other Part A benefits are incompatible with being a hospital inpatient. It requires discharge. That interpretation is impermissible. First, the agency's position violates the plain meaning of the statute. As Justice Kavanaugh pointed out, the agency reads the statutory terms entitled and eligible to mean the same thing. That is both inconsistent with the ordinary meaning of entitled and contrary to how the agency interprets entitled in the same sentence of the statute. The agency claims that the ordinary meaning of entitled doesn't matter because 426, according to the agency, controls and explains what Congress means by entitled to benefits under Part A. But that's wrong. 426 is not a definitional provision, and in any event, it addresses a different issue. Second, the agency's interpretation is unreasonable. HHS's rule provided almost no justification for its repudiation of an interpretation that it held for over two decades. Most fundamentally, despite interpreting a statute governing dish payments, it didn't even assess what impact its interpretation would have on dish payments. We now know, 15 years later, that the effect is to reduce the Medicare fraction over 80% of the time. Since the agency's interpretation can only also reduce the Medicaid fraction, it can never increase it, this means that the agency has once again categorically excluded indigent patients in violation of Congress's clear instructions. Unless there are questions from this Court, I'll begin with the statute's plain language. Just one quick question. There are other provisions that hinge on whether or not someone is entitled to benefits under A. But if you limit entitlement as you want, as you suggest, what do you do with those enrolling under C or D? And what do you do also with the conflict the government pointed out with 1395L that seemed to suggest that you can both exhaust and still be entitled to benefits? Your Honor, we think it's possible for statutes to ask different questions, and there is a distinction between asking whether a patient is generally entitled to Medicare benefits, are they a Medicare beneficiary generally, and we think those other statutes ask that question, but that's not the question that this statute asks. And the proof is that this statute specifically qualifies entitled to benefits for such days. So the question that this statute... But then you are suggesting that the interpretation of this provision would be out of culture with other provisions in the Medicare statute, and you would be relying just on the parenthetical for such days. So as much as we can say to the government, well, you're saying entitled means two different things, I mean, you have an equal or greater problem, which is that you are interpreting this phrase in a way that's very much not the way we would interpret this phrase in the rest of the Medicare statute. Your Honor, I think the key distinction is the four such days. And tellingly, that language does not appear in any of these other provisions that the Secretary cites, right? It doesn't say if you are entitled to Medicare for such days or for any particular days, then you can enroll in Part B. It says if you are generally entitled to benefits under Part A, full stop, or if you're a Medicare beneficiary generally. And we agree, Your Honor, that these patients are still Medicare beneficiaries generally. As the Secretary points out, there are benefits they could access once they are discharged, not as hospital inpatients. They can't get skilled nursing benefits while they're an inpatient or home health benefits at a hospital. So they're still Medicare beneficiaries generally. But again, that's not the question that the DISH statute asks, because it has language that's not found anywhere else. But that language might mean what you think it means, or it might mean something entirely different. I mean, you say that the government's reading turns that language into a superfluity, but it's not. That language continues to perform a very important function, and a function that Congress might well have thought about when it was drafting this statute, which was, oh, we have to deal with the people who turn 65 during their hospital stays. I mean, that's not an inconsiderable number of people. This is a gigantic program. People turn 65 every day. It would make complete sense for the drafters of the statute to say, you know, we have to put in something about, like, prorating it for the people who turn 65 in the middle. Your Honor, it's not just that four such days would do very little work, and this Court has rejected... I mean, that's a lot of work. A lot of people turn 65 during, you know, every day in this country. Right. I don't know how many do it while they're inpatient, but there's a more fundamental point, and that that language would be completely unnecessary, because remember, the unit of measurement here is days. And so according to the Secretary, what four such days does is tell the HHS, you cannot treat a specific day as being entitled to benefits under Part A until the patient has met the bare minimum for Medicare eligibility requirements. But no rational person would treat days as being entitled to benefits under Part A before the beneficiary had met the Medicare eligibility requirements. And in fact, Your Honor, the same thing holds true for the Part B enrollment and the Part C enrollment and the Part D, right, where no one would allow a person that had not yet met the basic Medicare eligibility requirements to enroll in Part B, and yet four such days doesn't appear in any of those languages, and HHS isn't allowing folks to enroll in Part B before they've met the general Medicare eligibility requirements, because it's obvious. So it's not just that it would have very little work, but the work it does, the four such days under the Secretary's interpretation, is completely unnecessary. You will agree, won't you, that in the abstract and particular context that entitled and eligible, entitled to and eligible for can be used as synonyms? It's basically Mr. Bond's point that entitled to does mean, it's conceding, I guess, for purposes of argument, that you have a right to something. But the question is a right to what? If I say that, okay, I'm 65, I'm entitled to Medicare benefits, that's true. I'm entitled to Medicare benefits if this, this, and this are satisfied, which would be the same thing as saying I'm eligible for those benefits if I meet those criteria. Your Honor, I think in some cases, and speaking loosely, occasionally those terms could be used synonymously. I think when they're juxtaposed as they are here, two different words in the same sentence, because it talks about folks that are entitled to benefits in the Part A and eligible for Medicaid. When those words are juxtaposed in the same sentence, then we have to actually look at what the distinction between those two words. We're not looking for the commonality because Congress chose two different words. Well, but the distinction is that the statutes are different and that the statutes use those two words differently. And the government essentially picked up the entitled to from the Medicare statute, where it consistently functions in the way the government suggests, and the Medicaid statute uses a different vocabulary. And the Medicare statute uses a vocabulary that, as the Chief Justice says, is very consistent with ordinary meaning. Ask any 65-year-old, are you entitled to Medicare? And the answer is going to be yes. And it's really not going to matter whether they've exhausted their 90 days of coverage. Your Honor, I think if you ask any ordinary person that has exhausted their Medicare benefits and that Medicare is not paying a penny for, and that if they're lucky, Medicaid maybe is picking up the tab, if you ask them, are you entitled to Medicare benefits for these days, for these days after you've exhausted, I think most folks would say, no, I'm entitled to no benefits. That isn't what the statute says. The statute says entitled to benefits under Part A of Medicare. Let's try it out, ordinary language. Math class, high school, teacher has a list of special rewards. Part A says ice cream, ice cream but no more than two a week. So the kids use two a week. Yeah, but he needs the reward, he deserves the reward. He's entitled. He's entitled to ice cream under Part A. He fits within it. But he's not eligible for ice cream now because he's already had his two for the week. So I read that and try and put it in my ordinary English ice cream high school mind, and there we are. And I have an ordinary meaning that seems to me closer by that much to what the government says than what you say. So suppose I believe that. Next question, Chevron. Okay. Gee, do you really apply Chevron where they're so mixed up that there are only two people in the United States when they put out the notice and comment and nobody understands what it means and they don't even know what their own program is? Hmm. I'm stuck. All right. What do I do? So two quick points, Your Honor. On the ice cream example, I think if you asked that student that had used up his two ice cream cones on Wednesday and you ask him on Friday, are you entitled to ice cream today for such day, for this Friday? He'd say, no, I used it up. But it doesn't say for this Friday. It says under Part A. And if you ask him, are you entitled to ice cream under reward announcement Part A, he'd say, well, yeah. I just don't get it now because I used them up. Well, I respectfully disagree, Your Honor. But to your Chevron question, I think there are actually two problems. The Chief Justice pointed out one of them, which is that the premises for Chevron deference, simply the primary one, which is that there was an implicit delegation from Congress, which is what Mead and Epic said, simply does not exist here. Congress may have started off giving the agency broad discretion in the 1983 where it said go make an adjustment. After the agency refused and refused, as Mr. Chief Justice pointed out, Congress got more and more prescriptive until it came up with a very detailed, unusually detailed provision that was meant to cabin, that was meant to tie the agency's hands and force the agency to act. And so we think in this context, presuming that there was an implicit delegation of authority is unfound, is belied by the record. And it turns out Congress had good reason to be wary of giving the agency discretion because even under those clear instructions, the agency repeatedly violated the clear instructions, as the amici for certain hospitals and health systems pointed out. You and Mr. Bond have both said a lot about what Congress intended, but do you really think that a majority of the Senate and a majority of the House thought through the particular question that faces us in this case, and they all said, yes, your interpretation is the right interpretation. That's what we want. Do you seriously want to make that argument? Your Honor, we think the language speaks for itself, and it's quite prescriptive, and Congress went out of its way in a statutory language, you can just focus there, to define what universe of patients would be subject to that stricter entitled SSI standard. And that universe of patients were hospital patients who, for such days, were entitled to benefits under Part A. Well, could you, I understand your argument, and there's a lot of force to it, but could you compare what a person has to do upon turning 65 in order to get Medicare Part A with what a person has to do in order to get Medicaid. I'm sorry, in order to get SSI. Your Honor, I think there's a fundamental point that I want to make on the SSI, that both in its briefing and oral argument today, I think there could be a misimpression that the Secretary only excludes SSI-eligible folks who haven't applied for SSI, and that's the distinction, what you need to apply. On the contrary, though, HHS excludes large numbers of patients that have applied for SSI, been determined eligible for SSI, and simply did not receive their SSI benefits. Well, the point is, how many hurdles do you have to clear upon turning 65 in order to get Medicare Part A? And how many hurdles do you have to clear in order to get SSI? My impression is that you don't have to do very much to get Medicare Part A, and you have to do more to get SSI. Is that wrong? It's not complete, Your Honor, I think for two reasons. As Justice Barrett pointed out, there are categories of Medicare beneficiaries that need to apply, if they are based on age, if they're disabled, etc. Even for those who are 65, it's if they also get their Social Security retirement benefits, which requires an application, you have to ask, and you can determine when you ask for those Social Securities, so the difference isn't that great between the two. But more fundamentally, Your Honor, again, going back to my point a moment ago, even if patients have applied and been determined eligible for SSI, the Secretary will still exclude them, even though they've applied and have met all the statutes simply because they don't receive the benefit. We cite in our briefs patients that refuse direct deposit or whose checks were returned as undeliverable. Those folks are excluded. Clearly, they applied for SSI. They're trying to send them their SSI checks. Can I keep going? Well, I was just going to conclude, Your Honor, these folks are being excluded, not because they didn't apply, but because they simply did not receive their SSI cash for some reason. I want to go back to Justice Alito's question about Congress in the 1980s. My understanding, correct me if I'm wrong, is that the two committees involved were House Ways and Means and Senate Finance, which were deeply involved in the particulars of these programs, two of the most expert staffs in the Congress then and now, and were deeply involved. And then, secondly, correct me if I'm wrong, I mean, there's hospitals in most districts. Members of Congress, at least in my experience, are pretty attuned to payments to hospitals, but maybe you have a better understanding of this than I do. That's completely correct, Your Honor. I mean, I was focused on the statutory text, but if you look at the legislative history, it's remarkably robust. These terms were debated. They evolved, et cetera. And the agency's overall point is to focus on this concept that Congress meant these fractions to be hermetically sealed, that no indigent patient should move from one fraction to the other. And first, there's very little basis for that because even under the Secretary's interpretation, a patient could move from one to the other. The legislation evolved at some points. The Senate was considering including Medicaid beneficiaries and vice versa. But more to the point, what's clear is that what's important in the legislative history isn't whether an indigent patient might move from one fraction to the other. It's that the indigent patient be counted in the first place. Under the Secretary's interpretation, Justice Kagan, to your question, the practical impact, instead of increasing reimbursement, instead of giving hospitals increased dish payments for treating clearly indigent patients that exhaust their benefits, 80% of the time, the Secretary's interpretation decreases. Yeah, but the purpose here can't be thought to be, you know, over and over you say in your brief, well, you know, the purpose is satisfied if hospitals get more money. But that's not right. I mean, Congress put together a formula, and it was a formula for counting low-income patients. And the question is, who has the best reading of that formula? And I guess, you know, going back to Justice Alito's question, it does strike me as, I mean, this formula, there are good arguments on both sides about what this formula means. And similarly, if you look at the actual populations that are covered or not covered in these two formulas, it's just not clear which one is more reflective of a desire to subsidize hospitals with low-income patients. You know, the question is, you know, how and which low-income patients? So I guess this goes back to Justice Breyer's question. You know, assuming that to us or to me, it doesn't leap off the page what this formula means, you know, what should we do about that? Yeah, Your Honor, I don't think you should accord a Chevron deference. And since it's not the best meaning of the statute, I think this Court should overturn it, should say the better reading is giving words to ordinary meeting, distinguishing between entitled and eligible, not rather equating entitled and untitled as it appears in the SSI and the Medicare fraction. And it's a good ‑‑ I didn't finish my answer to Justice about the deference, that there's a kind of a second reason why deference isn't warranted, right? Not just the lack of implicit delegation under these circumstances, but the Encino point, which is that the final rule, there's a lot to be said about the proposed rule, but we don't even need to go there. If you just look at the final rule itself, there was almost no reasoning given for a change of 20 years of practice affecting many millions of dollars for indigent patients. That's almost exactly what happened in Encino, right? The agency engaged in notice and comment rulemaking in Encino, but it had a summary statement that it thought its policy was a reasonable interpretation of the statute. And this Court said that's not good enough, particularly when you're repudiating prior practice, and that's exactly what went on here. One thing that seems to me attractive about the government's proposal is that the government has a sort of simple theory of the two formulas and how they're supposed to work together. In other words, that the two formulas are really meant to address two different populations. One is supposed to address the senior population, and the other is supposed to address the non-senior population. And the formulas weren't, you know, if that's true, that the dual eligible patients are supposed to be reflected in the Medicare formula because they're seniors. And we're not supposed to be doing this in such a way that people are bopping back and forth between the two formulas in both a hard-to-administer way, but also a kind of like why would that have happened way. So the government's theory of what these formulas were meant to do seems a lot more sort of simple and straightforward than yours does to me. Your Honor, I suppose one fundamental point. By Congress using the term four such days, again, in its wisdom, it kind of eschewed the idea of simple, right? Because, I mean, it specifically required analysis, a day-by-day analysis, precisely what the Secretary said. Well, on your theory of what that means, it does, but not on the government's theory of what that means. On the government's theory of what that means, it was just meant to kick out people who, kick out the days that people were in hospitals before they were 65. Yeah, I think another theory requires a day-by-day analysis. In one case, you know, according to the government's theory, which, as I discussed, makes no sense because there's no reason to tell HHS don't treat people as entitled to benefits on the part A before they've met the Medicare eligibility criteria. Can you make your argument without relying on that parenthetical? Yes, we can, Your Honor. Because in either case, even without that parenthetical, the agency is still equating entitled and eligible, even finding the same reason, and that's kind of beyond dispute. In the Ninth Circuit, the government continues. Yeah, I guess I would say, can you make your argument back to my question about what these formulas are supposed to do without relying on that parenthetical? The government, you know, is like, this is the senior formula, this is the non-senior formula. That makes a lot of sense. Yeah. Your Honor, I mean, there's at least one other answer, and I think there's probably more, but it makes sense for Congress to focus on who pays because the payment is different. Medicare generally is known to pay more generously than Medicaid. So it makes some sense for Congress to have said, if Medicare is paying for this patient and you're getting, you know, generally reasonable payment, the more stringent entitled to SSI criteria apply. So you're actually entitled, not just eligible for SSI. But if Medicare isn't paying and you're relying on Medicaid payments, which are generally pretty poor, then in that case we need a more generous standard to apply, and so you go into the Medicaid fraction. Counsel, if I might circle us back to Justice Breyer's question a moment ago. If we thought this were ambiguous, this statute ambiguous, and your first argument against deference to the government is that this matter wasn't assigned to it because Congress became so prescriptive. Got it. Your second argument, which you call your Encino argument, I think, I might think of it as a Chenery argument, if you want to put it in those terms, is the government is now relying on different sets of arguments than were in rulemaking, and that should be taken into account before we granted any kind of deference. I think the government's argument in response to that one, though, was that the deference belongs to the substance regardless of what procedure was used to adopt the rule. What do you say to that, number one? And number two, moving beyond those two arguments, you can think of it as Meade and Chenery or Meade and Encino, do you have a third, or is that it? On the first question, Your Honor, it's actually very similar. There were problems in the procedure itself, and again, we're willing to put that aside. It's in our brief. I think it speaks for itself. But if you look, then, at the outcome of the rulemaking, so the substance of it, what the agency said to justify its policy, in that case, again, it's on all fours with Encino, where, again, Encino, I don't think there was an allegation that, as it could be here, that the agency misstated its policy, et cetera, but it was simply the fact that the rationale given was insufficient, was unreasonable, to support particularly a radical change in policy, and that applies here, too. I agree on the Chenery point. 426 never came up in the rulemaking. The phrase, four such days, which the Secretary says was the whole thing that changed, it's interpreted as four such days, doesn't appear anywhere in the rulemaking. The legislative history isn't cited in the rulemaking. The agency didn't even do an impact analysis on a rule about payments. That's a third, then, if I'm understanding your answer correctly, that's a third problem, a lack of reasoned explanation. They didn't address particular aspects of the problem. Correct your honor. Exactly. I'm still stuck in what we do. Actually, it's a rather pretty difficult case for me. I mean, I think what Justice Gorsuch said is probably right. I mean, I have an awful qualm about using Chevron here. The point of it is it's supposed to be a reasonable member of Congress who would have wanted the agency to figure this out and where it figures it out. It doesn't figure it out. It gets everything mixed up. It's a pretty tough case to use Chevron. Okay. So then what do we do? I mean, if the language slightly goes in their direction, and now we have Justice Kagan's argument, which is probably all created in 2020, 2021, to justify something that was done who knows why in 2008 or 2003, at that point I am actually baffled. I know you're just going to say decide for us, but that isn't going to help me when you just say that. Do you think of anything else to say? I can, your honor. I think in some ways this is an easy case with all due respect because the Secretary's interpretation, admittedly, the Secretary admits requires departure from the ordinary meaning of entitled, requires the violation of all sorts of statutory canons, requires equating entitled to eligible, departing from the ordinary meaning of entitled, rendering for such days superfluous, but we think it clearly does, and all of that is based on its view that 426 controls. But 426 is not a definitional provision. Title II has definitional provisions, and 426 is not among them. The Medicare statute has a definitional provision, and entitled isn't defined there. Counsel, doesn't 426C help you? I thought 426A and B, which the government is relying on, to equate entitlement with eligibility. I read C, and it's clearly saying, which is made subject to A and B. A and B are made subject to C. It says entitlement of an individual to hospital insurance benefits for a month shall consist of entitlement to have payment made under and subject to the limitations in Part A. I mean, it's taking away exactly what they claim, that eligibility and entitlement are equated, isn't it? Your Honor, we agree. And the second point, besides not being a definitional provision, and perhaps more importantly, is the point that, as you just said, 426C, far from departing from the ordinary meaning of entitled, specifically links entitlement to payment, as does 1395D, a provision that actually appears in the Medicare statute, that says almost the exact same thing. Entitlement is not a badge of honor of a Medicare beneficiary. What it is is payment for services, and these patients were entitled to no payment of services for the days that they were hospitalized. So, on our bottom line, do we reach the better reading? I'm assuming you're saying Chevron doesn't apply for four or five different reasons. We have to give it the better reading, and the better reading is yours because of all of the reasons Justice Kavanaugh set forth earlier, and the additional ones developed, correct? Correct. Have we left out any other reason why yours is the better reason? Or the better reading, I'm sorry. Your Honor, I think we covered the basis. Justice Kavanaugh listed the five points. We agree with those. Chief Justice added the sixth. I think among those six, I think we've covered the basis of the reasons. Can I ask how the four such days worked in practice in the first two decades? Someone would go through and say, this patient, on November 10th, received Medicare benefits for that hospital stay. On November 11th, they've received Medicare. On November 12th, they did not. It was done at that granular level. It was, Your Honor, and it was even more simple because once a patient had exhausted their Part A benefits, they simply were no longer counted. Medicare didn't care. They weren't paying for those A's, so they couldn't possibly. The agency had to create a whole mechanism for tracking these patients after they've exhausted their benefits so that they could begin to add them to the Medicare fraction because before that, there wasn't a mechanism because they weren't being paid. Medicare didn't care. And one thing, this is now back to a big-picture question, what's the practical impact of the difference between your two arguments here? I mean, we're sitting here removed from how it's going to affect hospitals that serve poor patients, but is there, you know, what's the impact? Yeah, the impact is very significant, Your Honor, particularly on these hospitals, their safety net hospitals. As Amiki pointed out, safety net hospitals have much thinner margins than hospitals in general. We're a couple of percent. I know my friend on the other side said, oh, you know, it's just a percent or two. For these hospitals, that can be the difference between keeping their doors open or closed. And the study we cite in our brief in Amiki's site shows that the average impact, the total impact of this policy is about $150,000. This is back in 2005, so updated for inflation. And with inflation being what it is, who knows what that number would be today. But even at 150,000 times about 1,000-ish hospitals over 10 years, we're talking about a lot of money for hospitals that really need it. And, Your Honor, it raises a question, again, I just want to make this clear, that these hospitals are losing money. It's not, if you ask, if you ask the question, would their dish payments increase or decrease by treating these indigent, exhausted day patients, or stay the same? Do their dish payments increase, decrease, or stay the same? The answer is their dish payments decrease. They get less dish payments for treating these patients. And the proof is that it decreases the Medicare fraction, right? By treating these patients, it has no effect on the Medicaid fraction. They're already excluded under the Secretary's policy. What does it do to the Medicare fraction? It decreases it. So it leads to a net loss in dish payments. It's not that they stay the same, or they go up, but don't go up as much as we'd like. It's that they actually go down. The agency has turned it on its head. It turned what's supposed to be an incentive, as this court held in Alina, to treat inpatients, and turned it into a disincentive. You'll get less money. We'll reduce your dish payments for treating these clearly indigent patients. I just wanted to make sure that that was clear. Thank you. Justice Thomas, anything further? Just one question. Are inpatient services the only benefits under Part A? Because I think so much of your argument is premised on that being the only benefit, and that that benefit would be exhausted. It's the only benefit a patient can receive while an inpatient. There are other benefits that are categorically incompatible with being an inpatient. So upon discharge, if they met the other criteria, many of these patients aren't discharged, they die in the hospital, unfortunately. But if they were discharged and they met the other requirements for skilled nursing benefits, Part A would cover that. They might be able to get home health. But as the name suggests, all of those additional possible potential benefits at another time do not apply while the patient is an inpatient in the hospital, Your Honor. I understand that, but if we're going to premise our analysis on exhaustion, it doesn't seem as though the benefits under Part A are exhausted if those benefits are still available. Again, Your Honor, and because of the way the DISH statute is structured, it says are you entitled to benefits for these days, for these hospital patient days, for such days. And that's clearly focused on while the patient is an inpatient. And while the patient is an inpatient, they are entitled to no Part A benefits. They might be upon discharge, again, in a different time, different circumstance. But at that moment, for those days, they are entitled to no benefits and receive no benefits under Part A. Well, but if you read entitled broadly, they're still entitled to the other benefits, whether or not they have applied for them. So technically, they're still entitled to some benefits. Your Honor, I agree. And I think that's the question, like the Part B enrollment and the Part C enrollment. That's the question those statutes are asking, and they don't include the proviso for such days. They're saying are you generally a Medicare beneficiary, yes or no? In the DISH statute, unlike all those other provisions, it specifically has a restrictive qualifier that takes a snapshot in time and says right now, on this day, are you entitled to benefits under Part A? And the answer is no. Tomorrow, upon discharge, I might be. Today, I'm not. Yesterday, maybe I was. Thank you. Justice Breyer? Justice Alito? Let me add one more question. Which interpretation best fits the design of what these provisions are supposed to do? And could you just explain why you think yours better fits the design in the simplest possible terms? Why does yours fit better? Your Honor, obviously the Secretary was for our policy before it was against it. So for 20 years, it held the same policy. Okay. That's the design. Why does yours better fit the design? I think, Your Honor, I mean, statutory language, but I think then if by design you mean like what the stated intent, I mean what the purpose, the purpose of the DISH fraction, right? As a hospital's DISH fraction goes up, its DISH payment is supposed to go up. That's the way it's designed. The two work in tandem. Higher DISH percentage, higher payment. In this case, as I was explaining a moment ago, the Secretary threw that on its head, and by treating exhausted indigent patients, the more of those patients you treat, the lower your DISH payment goes. It's not just that it stays the same, it doesn't go up as much. It marches downwards. That is completely inconsistent with, I think, what this Court recognized was the purpose and the design. Excuse me. Are you saying anything more than the purpose is to give you money and your provision gives us, your interpretation gives you more money? Are you saying anything more than that? I am saying something more than that, Your Honor. I'm saying that the purpose, as this Court held in Alina, was to, and this Court used the word incentivized, to provide the resources and incentive to treat indigent patients. And by turning it on its head, it's not just more money, but if you start taking money away for treating indigent patients, which, as I was saying, that's the phenomenon, over 80% of the time, you're actually losing money, that it turns the whole DISH payment into a penalty, and that's inconsistent with the design. And it gets to that place by violating multiple canons of statutory interpretation on top of it, right? Yeah, no, I know about all the canons of statutory interpretation. All right, thank you. Justice Sotomayor? Thank you. Justice Gorsuch? Justice Kavanaugh? Just so I understand that, your answer there, I mean, two things you're supposed to track, because the formula is supposed to track the number, roughly, of poor patients a hospital serves, and the more they serve, the payments are supposed to correspond. And this, you say yours more accurately tracks that, right? Correct. That's right. Okay. Thank you, counsel. Mr. Bond, rebuttal? Thank you, Mr. Chief Justice. Four points. First, I understand Respondent to have confirmed that his reading requires making the Medicare fraction an island within the Medicare statute,  a reading of that phrase that four circuits rejected in the Medicaid fraction context. As I think the colloquy illustrated, our reading does not render that phrase superfluous, because it tells you at what point in time do you measure a person's entitlement. But beyond that, that phrase can't change what entitled means or what it takes to be entitled, which the statute sets forth. And the phrase doesn't give you a reason to think that a person whose Medicare doesn't pay for is any more low income than another. So it doesn't fit with the basic statutory design. And finally, it disregards the additional benefits that Justice Thomas pointed out are still available under Part A. Second, Respondent referred to the SSI benefit calculation and what codes are included. The agency specifically addressed this in the 2010 regulation cited in our reply at page 10. The key part is at JA 179 to 83, and on the codes at 181 to 83, the agency explained that it got the codes from the Social Security Administration to confirm that it had the right codes to track entitlement. The agency's view is not that unless the check lands in your mailbox, you're not entitled. It's rather if you meet the criteria as determined by SSA, then you are entitled. But if we're wrong about that, the answer is not to skew the meaning of the provision that is in front of you. Neither court below addressed the SSI fraction. The district court concluded it lacked jurisdiction to do so, and that is pending in another case. So I would leave that to one side and decide the question that is in front of you. Third, on the question of the agency reasoning and the explanation that it provided, at a general level, I don't think the agency is required in a rulemaking to provide all of its legal arguments and rebut every possible legal challenge to get Chevron deference. That would regenerate to require putting appellate briefs into preambles. But in any event here, the agency has provided authoritative statements of its reasoning in a variety of places, not just the 2004 rule that's directly at issue. Those include CMS Ruling 1498R, discussed in our opening brief, which addresses Section 426 and the other Part A benefits, the 2010 regulation that I mentioned that addresses SSI benefits, and going all the way back to its decision in Edgewater, where it explained the overall design and population focus drove its approach to drop non-covered Medicare Part A patients from the Medicaid fraction. And fourth and finally, to the extent the Court is struggling to ascertain exactly what Congress is driving at in this very complicated statute, I think the answer is, regardless of whether there is any unambiguous answer, to go with the one that makes the most sense of the words Congress used and the overall architecture. Our approach does provide simplicity by saying you interpret who is entitled by looking at the provision that answers that question and says who is entitled, and you reject a reading that requires an exhausted patient not to be entitled because the statute says that. Our reading fits together at least better with the overwhelming majority of the Act's provisions and has a plausible, straightforward theory of the congressional design that fits with a population focus. And at a minimum, that's a reasonable reading on which Congress would want the agency's view to get deference. Thank you, Counsel. Counsel, the case is submitted.